IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| United Financial Casualty Company, | ) | Case No. 3:24-cv-00370-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| United Transit Lines, Inc.; | ) | |
| United Transportation Lines, Inc. | ) | |
| *d/b/a UTL, Inc.*; Santokh Singh | ) | |
| Sangha; Mary Foster; Old Republic | ) | |
| Insurance Company, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |
| Mary Foster, | ) | |
| | ) | |
| Cross Claimant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| Old Republic Insurance Company, | ) | |
| | ) | |
| Cross Defendant. | ) | |
| _____ | ) | |

This matter is before the Court on motions for summary judgment by Defendant/Cross Claimant Mary Foster ("Foster"), Defendant/Cross Defendant Old Republic Insurance Company ("Old Republic"), and Plaintiff United Financial Casualty Company ("Progressive"). [Docs. 82; 83; 86.]

Progressive filed this declaratory judgment action on January 24, 2024, regarding insurance coverage issues arising out of a motor vehicle accident. [Doc. 1.] On August 6, 2025, Foster, Old Republic, and Progressive filed summary judgment motions.

[Docs. 82; 83; 86.]   The motions have been fully briefed and are ripe for review. [Docs. 80–81; 84–85; 91–102; 105–06; 108; 108–12.]

## BACKGROUND[1]

In ruling on a motion for summary judgment, this Court reviews the facts and reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *see also Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 433 (4th Cir. 2013).   On cross motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

**The Accident, Insurance Policies, and Underlying Lawsuit**

This action arises from a motor vehicle accident (the "Accident") that occurred in South Carolina on I-26 East on January 9, 2019, at or around 12:50 p.m. Eastern Time, involving a 2019 Kia in which Foster was a passenger and a 2018 Freightliner (VIN 1FUJGLDR0JLHT1081) (the "2018 Freightliner") operated by Defendant Santokh Sangha ("Sangha") and pulling an unidentified trailer.   [Doc. 80 ¶ 1.]   During an examination under oath, Sangha testified that he was driving for "UTL" at the time of the Accident and that his UTL contact was "Ali."   [*Id.* ¶ 6.]   He had dropped off a load in Atlanta, Georgia, and was proceeding to South Carolina to pick up another load. [Doc. 80-1 at 41 (34:1–8).]

---

[1] Pursuant to the undersigned's Rule 56 Summary Judgment Motion Procedures, the parties submitted a joint statement of undisputed material facts, movants' statements of material facts, opponents' statements of material facts, reply statements of material facts, and various attachments.  [Docs. 80; 80-1; 81; 84; 84-1–84-9; 85; 85-1–85-3; 91; 93; 95; 97; 101; 102; 108; 109; 109-1.]  The Court will cite to these documents for the relevant background included herein.

At the time of the Accident, Muhammad Ali ("Ali") and his associate, Jaskaran Ghuman ("Ghuman") were associated with Defendants United Transportation Lines, Inc. (USDOT 2517477/MC-873622) ("United Transportation") and United Transit Lines, Inc. (USDOT 2272056/MC-00775901) ("United Transit").  [Doc. 80 ¶ 7.]  Progressive issued a commercial automobile liability policy to United Transit, Policy No. 08086963-0, to United Transit's address in California for the period August 27, 2018 to August 27, 2019 (the "Progressive Policy"), which provided a combined single limit of $1,000,000 for "insured autos."  [*Id.* ¶ 10.]  Old Republic issued a business auto liability policy to Ryder System, Inc.[2] as the first named insured for the period October 1, 2018 to October 1, 2019 (the "Old Republic Policy").  [*Id.* ¶ 8.]  The Old Republic Policy contains an MCS-90 endorsement issued to United Transportation ("Old Republic's MCS-90 Endorsement" or the "Endorsement") that was effective on the date of the Accident.  [*Id.* ¶ 9; Doc. 80-1 at 76–78.]

On January 19, 2021, Foster initiated a lawsuit in the Richland County Court of Common Pleas, captioned *Mary Foster v. Santokh Singh Sangha and United Transportation Lines, Inc.*, 2021-CP-40-00248 (the "Underlying Lawsuit"), to recover damages for injuries she claims to have sustained in the Accident.  [Doc. 80 ¶ 43.]  No one appeared on behalf of, or otherwise defended, Sangha or United Transportation in the Underlying Lawsuit and an entry of default was entered against those defendants on

---

[2] Old Republic represents that "United Transportation has no corporate relationship with Ryder System, Inc." but that "in 2018, Ryder Truck Rental, Inc. entered into a Truck Lease and Service Agreement ('TLSA') with United Transportation, pursuant to which, Ryder leased several vehicles to United Transportation under separate Schedule As to the TLSA, and at United Transportation's request, extended coverage to United Transportation under its auto liability insurance policy for the leased vehicles."  [Doc. 83-1 at 4 n.3.]

July 15, 2021.  [*Id.* ¶ 44.]  The judge referred the Underlying Lawsuit to a special referee for the purposes of setting a damages hearing.  [*Id.* ¶ 45.]  No one appeared on behalf of Sangha or United Transportation at the damages hearing, and, thereafter, on December 21, 2021, the special referee entered judgment against Sangha and United Transportation jointly and severally for $1,000,000 (the "Default Judgment").  [*Id.* ¶ 46; Doc. 80-1 at 305–11.]

On May 26, 2023, Progressive received its first notice of the Accident and the Underlying Lawsuit when it received a letter from Foster's counsel demanding that Progressive satisfy the Default Judgment.  [Doc. 80 ¶ 47.]  After receiving the first notice of the Accident and the Underlying Lawsuit, Progressive retained defense counsel for Sangha and United Transportation pursuant to a full reservation of rights to deny coverage under the Progressive Policy.  [*Id.* ¶ 52.]  Defense counsel subsequently moved unsuccessfully to have the Default Judgment vacated.  [*Id.* ¶¶ 52–53; Doc. 80-1 at 326–27.]

**The Progressive Policy and Changes Made to That Policy**

The Progressive Policy provides liability coverage only for damages "for which an **insured** becomes legally responsible because of an **accident** arising out of the ownership, maintenance or use of [an] **insured auto**."  [Doc. 80-1 at 118.]  That policy— specifically the provisions entitled "Additional Definitions Used in This [Part I—Liability to Others] Only"—conditions the status of an "insured" under the policy on the involvement of an "insured auto."  [*Id.* (cleaned up).]  The Progressive Policy is a scheduled-auto policy, meaning that for a vehicle to qualify as an "insured auto" entitled to liability coverage, it must be specifically described on the declarations page or constitute a

4

replacement, additional (i.e., after-acquired), or temporary substitute auto, as the policy defines each of those terms.  [*Id.* at 114–15, 117, 119.]

The 2018 Freightliner was not identified as an insured auto on the declarations page of the Progressive Policy (the "Declarations Page") at the time of the Accident. [Docs. 80 ¶¶ 12, 25–26, 37–39; 80-1 at 213–14, 287–90.]  On January 7, 2019, two days before the Accident, Ghuman emailed RJS Insurance Services ("RJS"), the agent of record for United Transit, and requested, among other things, that the 2018 Freightliner and one other vehicle and Sangha and one other driver be added to the Progressive Policy effective January 7, 2019 for "[l]iability only" (the "January 7 Email").  [Docs. 80 ¶¶ 12, 13; 80-1 at 175 (emphasis omitted).]   However, RJS did not respond to the January 7 Email prior to the Accident.  [Docs. 80 ¶¶ 14–17; 80-1 at 178–83.]  Indeed, in a recorded phone call, Mark DiSalvo ("DiSalvo") of RJS stated to Progressive that RJS did not receive the January 7 Email when it was originally sent.  [Doc. 80 ¶¶ 13, 23.]

On January 9, 2019, at 2:06 p.m. Pacific Time, approximately four hours after the Accident had occurred, Ghuman forwarded DiSalvo the January 7 Email.  [*Id.* ¶ 15; Doc. 80-1 at 178–79.]  Following that action were a series of back-and-forth emails and phone calls on January 9, 2019 between Ghuman and various RJS employees, including DiSalvo, Susan Dias ("Dias"), and Thalia Hernandez ("Hernandez"), during a time in which it appears that neither Ghuman nor the RJS employees knew that the Accident had occurred.  [Docs. 80 ¶¶ 16–22; 80-1 at 181–95.]  On January 9, 2019, at 2:24 p.m. Pacific Time, Ghuman emailed DiSalvo indicating that Ghuman liked an idea DiSalvo had raised of bundling different coverages.  [Doc. 80-1 at 181.]  Ghuman requested that the changes being discussed—adding the 2018 Freightliner and one other vehicle and adding Sangha

5

and one other driver for liability and physical damage coverage (the "Additions")—be backdated to January 7, 2019. [*Id.*] DiSalvo therefore called Progressive to ask whether that would be possible. [*Id.* at 198–203; Doc. 80 ¶ 23.] Progressive ultimately informed DiSalvo that the Additions could be backdated as long as DiSalvo retained the email requesting that backdating. [Docs. 80 ¶ 24; 80-1 at 200–01 (4:21–5:2).]

Around the same time, as referenced in several recorded calls between RJS and Progressive, RJS quoted Ghuman the premium increase that would result from the Additions, which prompted Ghuman to convey to RJS that she no longer wanted physical damage coverage. [*See*, *e.g.*, Doc. 80-1 at 234–35 (7:24–8:20).] RJS had informed Ghuman that it would need confirmation of her choice in writing, as well as a statement of no loss, and that RJS would not make any changes to the Progressive Policy until RJS received such confirmation. [*Id.* at 192, 234–35 (7:24–8:5).] RJS attempted to wait for this confirmation and statement of no loss, but RJS ultimately became nervous that the vehicles were out on the road. [*Id.* at 235–38 (8:6–11:1), 254 (5:2–8), 255–56 (6:5–7:19).] On January 9, 2019, at 5:56 p.m. Pacific Time, RJS used the Progressive "ForAgentsOnly" portal to make the Additions itself, effective January 7, 2019. [*Id.* at 213–14; Doc. 80 ¶ 25.]

Less than one hour later, on January 9, 2019, at 6:37 p.m. Pacific Time, Ghuman finally responded to RJS's request for written confirmation, stating, "I spoke with Ali and he does not want to pay $35000 just to have two trucks on the road. He is having them turn around and come back to the yard. As of right now, please do not make any changes." [Doc. 80-1 at 223.] The next morning, at 9:59 a.m. Pacific Time, Ghuman followed up with another email to Hernandez that stated, "Please be advised that we did

6

not lease the vehicles after all after finding out how much it will cost us to insure them. [P]lease do not process the change." [*Id.* at 225–26.]  The recorded phone calls referenced the fact that RJS and Ghuman then had a phone call in which RJS explained that RJS had already processed the Additions the night before. [*Id.* at 235–36 (8:21–9:1), 254 (5:6–14).]  Ghuman was upset when she determined that RJS had processed the Additions without first receiving confirmation from her that she wanted them. [*Id.* at 254 (5:6–14).]  Dias specifically stated to Progressive that Ghuman told RJS, "[Y]ou guys weren't supposed to process that" [*id.* at 254 (5:14)] and that Ghuman was "extremely upset [that RJS] went ahead and added th[o]se vehicles" [*id.* at 235 (8:22–23)].

Ghuman then requested, as referenced in several emails, the recorded phone calls, and a letter sent by RJS to Ghuman and United Transit, that the Additions be undone. [*Id.* at 230–31 (3:20–4:3), 232–33 (5:25–6:4), 234–36 (7:10–9:1), 272–79.] RJS therefore called Progressive and attempted to undo the Additions. [*Id.* at 229–39.] Progressive initially told RJS that, to undo the Additions, it would need a statement from the lessor stating that United Transit never leased the vehicles. [Doc. 80 ¶ 31.] Progressive also initially told RJS that Ghuman would have to pay for the three days of premium for January 7, 2019, through January 9, 2019, since the Additions had been made effective January 7, 2019, and the removals would be effective only on January 9, 2019. [*See* Doc. 80-1 at 272.]  Nonetheless, Progressive eventually relented and agreed to reverse the Additions retroactive to January 7, 2019. [*Id.* at 276–77, 287–90.]  A letter from RJS to United Transit dated January 10, 2019, memorialized Ghuman's request. [*Id.* at 279.]  Reflecting the parties' back-and-forth communications, the Declarations Page, as revised on January 11, 2019, shows that the 2018 Freightliner became an

7

insured auto effective January 7, 2019 (the "January 11 Declarations Page Revision"). [*Id.* at 281–83.]  However, a revision of the Declarations Page dated the following day (the "January 12 Declarations Page Revision") reflects that the 2018 Freightliner was removed as an insured auto effective January 7, 2019.  [*Id.* at 289–90.]

**This Action**

Progressive filed this action against Defendants on January 24, 2024, seeking a declaratory judgment that the Progressive Policy does not provide coverage for the Accident and that Progressive has no duty under the Progressive Policy or under the MCS-90 or Form E/F endorsements attached to the Progressive Policy to indemnify or provide a defense against claims arising from or relating to the Accident.[3]  [Doc. 1 ¶¶ 43–53.] Progressive alternatively requests a declaratory judgment that, on account of breach of the notice and cooperation provisions of the Progressive Policy, it has no duty to defend and its indemnification obligation, if any, is limited to $75,000.00.  [*Id.* ¶¶ 54–57.]

Foster filed a crossclaim against Old Republic seeking a declaration that it is required to provide coverage, defense, and indemnification to Sangha and United Transportation for any judgment rendered against them for injuries arising out of the Accident.  [Doc. 17 ¶¶ 28–36.]

---

[3] Plaintiff alleges that the "Form E/F endorsement on the [Progressive] Policy is not triggered in connection with the Accident, the claims alleged in the [Underlying Lawsuit], or the Default Judgment because any surety obligation under the Form E/F endorsement only applies when [United Transit] is operating as a for-hire motor carrier in intrastate commerce within the geographical boundaries of the State of California . . . ."  [Doc. 1 ¶ 53.]  Because none of the issues currently before the Court pertain to the Form E/F endorsement or to the MCS-90 endorsement attached to the Progressive Policy, the Court does not discuss these endorsements.

## APPLICABLE LAW

**Motion for Summary Judgment**

Rule 56 of the Federal Rules of Civil Procedure states, as to a party who has moved for summary judgment:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant.  *Id.* at 257.  When determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

The party seeking summary judgment shoulders the initial burden of demonstrating to the court that there is no genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has made this threshold demonstration, the non-moving party, to survive the motion for summary judgment, may not rest on the allegations averred in his pleadings.  *Id.* at 324.  Rather, the non-moving party must demonstrate specific, material facts exist that give rise to a genuine issue.  *Id.*  Under this standard, the existence of a mere scintilla of evidence in support of the non-movant's position is insufficient to withstand the summary judgment motion.  *Anderson*, 477 U.S. at 252. Likewise, conclusory allegations or denials, without more, are insufficient to preclude granting the summary judgment motion.  *Id.* at 248.  "Only disputes over facts that might

9

affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  Further, Rule 56 provides in pertinent part:

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> (A)     citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B)     showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  Accordingly, when Rule 56(c) has shifted the burden of proof to the non-movant, he must produce existence of a factual dispute on every element essential to his action that he bears the burden of adducing at a trial on the merits.

The Fourth Circuit summarized the Court's obligation when faced with cross motions for summary judgment in *Rossignol v. Voorhaar*:

> When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.  When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion.

316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks and citation omitted).

## DISCUSSION

Progressive argues it is entitled to the declaratory judgments sought in its Complaint; both Foster and Old Republic argue the Progressive Policy covers the Default Judgment; Foster argues that Old Republic's MCS-90 Endorsement is required to satisfy

10

the Default Judgment; and Old Republic argues that it does not have any MCS-90 liability. [Docs. 82-1; 83-1; 86-1; 92; 94; 96; 98; 99; 100; 105; 106; 110; 111; 112.]  The Court will address coverage under the Progressive Policy and Old Republic's MCS-90 Endorsement in turn.

**Coverage Under the Progressive Policy**

### *The Parties' Positions*

Progressive argues that it is entitled to summary judgment for several reasons.  It first contends that the 2018 Freightliner does not qualify as an "insured auto" under the Progressive Policy.  [Doc. 86-1 at 9–14.]  Progressive argues that the only indication that United Transit contemplated insurance coverage for that vehicle under the Progressive Policy was the January 7 Email, which RJS did not receive or follow up on prior to the Accident.  [*Id.* at 9–10.]  Progressive argues that although Progressive at one point accommodated a request for the Additions, RJS and Ghuman subsequently both requested that Progressive undo the Additions retroactive to the date on which they had originally been effective so that United Transit would not have to pay premiums even for January 7, 8, and 9, 2019.  [*Id.* at 11–12, 14.]  Progressive contends that because it accommodated those requests to undo the Additions retroactive to the date they were made, the 2018 Freightliner is not an "insured auto" and Progressive has no duties under its policy in relation to the Accident.  [*Id.* at 11, 12, 14.]

Old Republic argues that the Progressive Policy provides coverage for the Accident because the January 11 Declarations Page Revision listed the 2018 Freightliner as an insured auto, effective January 7, 2019.  [Doc. 100 at 4–6.]  Old Republic contends that because the Progressive Policy contains an integration clause, no extrinsic evidence

11

can be considered that would contradict the policy's terms, and the Declarations Page in particular. [*Id.*] Old Republic and Foster also argue that language in the Progressive Policy "precludes Progressive (and its insureds) from making *post hoc* policy changes" once coverage is added. [*Id.* at 7; *see* Doc. 98 at 2–3.] Old Republic alternatively argues that there is a genuine dispute of material fact concerning whether the insured requested that the coverage for the 2018 Freightliner be removed for the time period that included the Accident. [Doc. 100 at 7–8.]

### *Analysis*

Having considered the parties' arguments, the Court concludes that Progressive is entitled to summary judgment. Although Old Republic is correct that the *January 11* Declarations Revision listed the 2018 Freightliner as an insured auto effective January 7, 2019, the *January 12* Declarations Page Revision did not list the 2018 Freightliner as an insured auto and it reflected that the removal of the vehicle's insured-auto status was also effective January 7, 2019. [Doc. 80-1 at 281–83, 287–90.]

Old Republic argues that because the Progressive Policy contains an integration clause, the Court may not resort to extrinsic evidence to interpret the Declarations Page. [Doc. 100 at 4–6.] However, the Court need not resort to extrinsic evidence to conclude that there was no coverage for the 2018 Freightliner for the date of the Accident. Rather, the Court need only consider the Declaration Page itself, as revised on January 12, 2019. The January 12 Declaration Page Revision plainly reflects that the undoing of the revisions was effective January 7, 2019, before the date of the Accident. [Docs. 80 ¶ 40; 80-1 at 287–90.]

12

As noted, Old Republic and Foster argue that the Progressive Policy prohibits the parties from retroactively removing a vehicle's insured-auto status. [Docs. 98 at 2–3; 100 at 7.] They rely on a provision from the Progressive Policy that states, "If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it." [Doc. 100 at 7 (citing Doc. 80-1 at 134).] The Court disagrees with Old Republic and Foster's interpretation of that language.[4] The cited language has a clear meaning; namely, once the insured asks to have a vehicle deleted from the policy, the insured loses coverage for that vehicle immediately, meaning there is no further coverage *after* the request. The language does not purport to address whether the insured and insurer can agree to remove coverage for a period *before* the request.

In sum, because the summary judgment record demonstrates that the 2018 Freightliner was validly removed as an insured auto effective prior to the Accident, the Court grants Progressive's motion for summary judgment.[5] For the same reason, the

---

[4] The parties disagree about whether the law applicable to the Progressive Policy is that of California, as Old Republic asserts [Doc. 83-1 at 2, 15–16, 23 n.5, 29], or South Carolina law, as Progressive asserts [Doc. 94 at 7–12]. [*See also* Doc. 82-1 at 4–5 (Foster citing to South Carolina law).] The Court need not resolve this disagreement because under either state's laws, the court must enforce the language of a policy if it has a clear meaning, *see John's Grill, Inc. v. Hartford Fin. Servs. Grp.*, 552 P.3d 1045, 1053 (Cal. 2024) ("When interpreting a policy provision, we must give its terms their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage." (internal quotation marks omitted)); *Diamond State Ins. v. Homestead Indus.*, 456 S.E.2d 912, 915 (S.C. 1995) ("Insurance policies are subject to general rules of contract construction" and policy language must be given "its plain, ordinary and popular meaning."), which the Court concludes this language does.

[5] Because the Court concludes that Progressive is entitled to summary judgment for the reason discussed, the Court does not address the issues of whether Progressive would also be entitled to summary judgment on the basis of its insured's noncooperation,

13

Court denies Foster's and Old Republic's summary judgment motions to the extent they concern Progressive's duties under the Progressive Policy.

**Coverage Under the Endorsement**

### *The Nature of MCS-90 Endorsements*

Before discussing the parties' arguments concerning Old Republic's MCS-90 Endorsement, the Court begins with some general information about the structure of such endorsements and the purposes behind them.

"Congress enacted the [Motor Carrier Act of 1980 ("MCA")], in part, to address abuses that had arisen in the interstate trucking industry which threatened public safety, including the use by motor carriers of leased or borrowed vehicles to avoid financial responsibility for accidents that occurred while goods were being transported in interstate commerce." *Canal Ins. v. Distrib. Servs.*, 320 F.3d 488, 489 (4th Cir. 2003). For that reason, the MCA imposes a financial responsibility requirement upon each motor carrier that is registered to engage in interstate commerce. *Id.* Under that requirement, a motor carrier must "file 'a bond, insurance policy, or other type of security' in an amount determined by the Secretary of Transportation and the laws of the State or States in which the motor carrier intends to operate." *Id.* (quoting 49 U.S.C. § 13906(a)(1); Pub. L. No. 96–296, § 30(c)).

"The MCA's financial responsibility requirements differ depending on where the motor vehicle is traveling and what it is hauling." *Lyles v. FTL Ltd.*, 339 F. Supp. 3d 570, 575–76 (S.D.W. Va. 2018). First, the requirements apply only for trips in which a motor

---

whether any coverage is reduced to $75,000, or whether Foster is entitled to post-judgment interest against Progressive. [Docs. 82-1 at 4–5; 86-1 at 15–26.]

vehicle "is used by a motor carrier or private motor carrier to transport property in the United States between a place in a State and (A) a place in another State; (B) another place in the same State through a place outside of the State; or (C) a place outside the United States." *Id.* at 576 (cleaned up).  Additionally, generally speaking, the amount of responsibility that motor carriers are obligated to maintain is $750,000 for vehicles transporting non-hazardous cargo, $1,000,000 for vehicles transporting oil and certain hazardous substances, and $5,000,000 for vehicles transporting other hazardous substances and radioactive materials.  49 C.F.R. § 387.9.  "A motor carrier may obtain the required amount of financial responsibility from more than one source provided the *cumulative* amount is equal to the minimum requirements . . . ."  49 U.S.C. § 31139(f)(3) (emphasis added); *see also* 49 C.F.R. § 387.7(d)(1) (requiring a motor carrier to maintain proof of the required financial responsibility, which may consist of, among other options, multiple MCS-90 endorsements).

In order to satisfy their financial responsibility requirements, "most interstate trucking companies obtain a specific endorsement to one or more of their insurance policies—the MCS-90 endorsement . . . ."  *Carolina Cas. Ins. v. Yeates*, 584 F.3d 868, 870 (10th Cir. 2009) (en banc) (citing 49 C.F.R. §§ 387.7, 387.9).  Such an endorsement "creates a suretyship by the insurer to protect the public when the insurance policy to which . . . the endorsement is attached otherwise provides no coverage to the insured." *Canal Ins.*, 320 F.3d at 490; *see also Trustgard Ins. v. Collins*, 942 F.3d 195, 198 (4th Cir. 2019) (noting that an MCS-90 endorsement "is not technically insurance," but rather, "a surety agreement"); *Yeates*, 584 F.3d at 878 ("[A]n MCS-90 insurer's duty to pay a judgment arises not from any insurance obligation, but from the endorsement's language

15

*guaranteeing* a source of recovery in the event the motor carrier negligently injures a member of the public on the highways.").

Under such an endorsement, the insurer issuing the policy obligates itself to "pay, within the limits of liability . . . any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the" MCA. Fed. Motor Carrier Safety Admin., U.S. Dep't of Transp., Form MCS-90 Endorsement for Motor Carrier Policies of Insurance for Public Liability under Sections 29 and 30 of the Motor Carrier Act of 1980, available at https://www.fmcsa.dot.gov/registration/form-MCS-90-endorsement-motor-carrier-policies-insurance-public-liability-under   (last   accessed Apr. 9, 2026).   The insurer is obligated to pay to the injured party "regardless of whether . . . each motor vehicle is specifically described in the [attached liability] policy and whether . . . such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." *Id.*

In circumstances where an insurer is obligated to pay under an MCS-90 endorsement but would *not* have been obligated to pay under the underlying liability policy absent the endorsement, the insurer is entitled to reimbursement from the motor carrier. *See id.* ("The insured agrees to reimburse the [insurer] . . . for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in [the MCS-90] endorsement.").   Thus, unlike a liability policy, an MCS-90 endorsement does not protect a motor carrier from incurring liability. *Travelers Indem. Co. of Ill. v. W. Am. Specialized Transp. Servs.*, 409 F.3d 256, 260 (5th Cir. 2005) (noting that an MCS-90 endorsement is "not an ordinary insurance provision

16

to protect the insured" in that it "does not extinguish the debt of the insured" but, instead, "transfers the right to receive the insured's debt obligation from the judgment creditor to the insurer"); *Am. Inter-Fid. Exch. v. Am. Re-Ins.*, 17 F.3d 1018, 1022 (7th Cir. 1994) ("The difference between suretyship and insurance lies in the identity of the person ultimately liable for the loss.  An insurer pays the claimant without right of recourse against its client; a surety pays the claimant but is contractually entitled to reimbursement from its client.).

### *Whether Old Republic's MCS-90 Endorsement Provides Coverage for the Accident*

#### The Parties' Positions

Old Republic has stipulated that "[i]f [the Progressive Policy] does not afford auto liability coverage in favor of [United Transportation] . . . , then the [Endorsement] would require Old Republic to satisfy any unsatisfied portion of the Default Judgment up to the federal financial responsibility limits, so long [as] it is determined that [United Transportation] was acting as a for-hire motor carrier at the time of the [Accident]." [Doc. 63 ¶ 4.]

Foster argues that if the Court rules that the Progressive Policy does not provide coverage, then she is entitled to summary judgment on her claim asserting that Old Republic is liable under the Endorsement to satisfy the Default Judgment in the amount of $1,000,000.[6]   [Doc. 82-1 at 6–8.]   On the other hand, Old Republic contends that

---

[6] To the extent that Foster has sought a declaration that Old Republic owes some duty to defend United Transportation or Sangha [Doc. 17 at 6], the Court notes that Foster has not identified any contractual basis for such a duty.  Rather, Foster has addressed Old Republic's duties to her under the Endorsement only, and such endorsements do not give rise to a duty to defend, *see Yeates*, 584 F.3d at 882–83 (contrasting the surety liability

because the Endorsement was issued to *United Transportation*, it does not create liability in this case because *United Transit* was the motor carrier involved in the Accident. [Docs. 83-1 at 31–33; 99 at 2–3.] Old Republic argues that the fact that Ghuman sought to add the 2018 Freightliner to a liability policy issued to United Transit—the Progressive Policy—for the specific trip during which the Accident occurred demonstrates that Sangha was not driving for United Transportation at the time of the Accident and the Endorsement does not apply. [Docs. 83-1 at 31–33; 99 at 2–3.] In contrast, Foster contends that the record demonstrates that Sangha was driving for United Transportation under United Transportation's motor carrier number at the time of the Accident and that Old Republic has forecasted no evidence that Sangha ever drove a truck for any other entity. [Docs. 96 at 3; 112 at 3.]

Analysis

The Federal Motor Carrier Safety Regulations provide that an "authorized carrier may perform authorized transportation in equipment it does not own" only if there is a written lease granting the motor carrier the right to use the equipment. 49 C.F.R. § 376.11. The forecasted evidence shows that it was United Transportation that leased the 2018 Freightliner from Pardeep S. Sangha, who is Sangha's son. [Docs. 80 ¶ 4; 80-1 at 4, 27 (20:3–5).] Specifically, the lease agreement (the "Lease") plainly states that the lessee is authorized by "Permit No/ Motor Carrier No. 873622," and, it is undisputed

---

created by an MCS-90 endorsement with liability insurance, with which "[a] motor carrier insures itself against possible liability in its business operations" and noting as well that an MCS-90 endorsement does not create any duty to defend); *OOIDA Risk Retention Grp., Inc. v. Charity Cont. Hauling, LLC*, 666 F. Supp. 3d 500, 508 (M.D.N.C. 2023) (concluding that the MCS-90 endorsement does not create a duty to defend).

that that number was assigned to United Transportation at the time of the Accident.[7] [Docs. 80-1 at 4; 80 ¶ 4.]  The Lease further provides that the lessee "shall have exclusive possession, control, and use of the equipment, . . . shall assume complete responsibility for the operation of the equipment for the duration of the [Lease, and] agrees to properly identify equipment with the Federal Highway Administrations 'MC' number and the name of the [lessee]."  [Doc. 80-1 at 4.]  Finally, although the Lease identified the lessee as "UTL, Inc," the Court notes that United Transportation added a d/b/a of UTL, Inc. to its name on file with the Federal Motor Carrier Safety Administration ("FMCSA") on or around January 15, 2019.  [Doc. 85-1.]  Sangha did not ever sign any other lease agreement with any of Ali's other companies.  [Doc. 80-1 at 32 (25:21–25).]

The record does not explain why Ghuman sought to add the 2018 Freightliner to a policy issued to United Transit rather than United Transportation.  Nevertheless, the Court concludes that this uncertainty is insufficient to create a genuine dispute of material fact as to whether the 2018 Freightliner was being operated for United Transportation at the time of the Accident.  Rather, given that United Transportation was the company that leased the vehicle [*see* Docs. 80 ¶ 4; 80-1 at 4], the Court concludes that no reasonable factfinder could find that United Transportation was not operating the 2018 Freightliner at the time of the Accident.  Accordingly, the Court rejects Old Republic's argument that a fact issue as to which company was operating the 2018 Freightliner precludes granting

---

[7] Additionally, it appears that Sangha testified that at the time of the Accident, the 2018 Freightliner was displaying motor carrier number 873622.  [Doc. 80-1 at 33 (26:20–25) (Responding to a question about whether the 2018 Freightliner was displaying the information for UTL, Inc. with a motor carrier number of 873622 on the side of the vehicle, Sangha answered, "It must be theirs because I . . . don't know much about it.").]

summary judgment to Foster on her crossclaim.[8]  Accordingly, the Court concludes that the Endorsement provides coverage for the Accident.

### *Whether the Limit of Old Republic's Liability Under the Endorsement is $750,000 or $1,000,000*

<u>The Parties' Positions</u>

Foster argues, in support of its own summary judgment motion and in her response opposing Old Republic's motion, that, to the extent that United Transportation was operating the 2018 Freightliner at the time of the Accident, the summary judgment record demonstrates as a matter of law that Old Republic is liable under the Endorsement for $1,000,000.[9]  [Docs. 82-1 at 6–8; 96 at 3–5; 112 at 3–6.]  In its response opposing Foster's summary judgment motion, Old Republic contends that to the extent it is liable under the Endorsement regarding the Default Judgment, its liability is limited to $750,000,

---

[8] In both its initial brief and its reply brief in support of its summary judgment motion, Old Republic asserts that to prove that the Endorsement applies to the Accident, Foster must show that United Transportation was "actually transporting property for compensation at the time of [the Accident]."  [Doc. 83-1 at 32.]  In its initial brief, Old Republic argues that it is entitled to summary judgment because Foster has not forecasted evidence that it was United Transportation rather than United Transit that was transporting property at the time of the Accident.  [*Id.* at 32–33.]  In its reply brief, Old Republic's argument is much shorter and less specific.  [Doc. 106 at 2–3.]  It argues, "While Foster has presented evidence of interstate travel, she has literally provided no evidence that United Transportation received compensation for the transportation of property."  [*Id.* at 3.]  To the extent Old Republic now intends to argue that Foster has not forecasted evidence that any transportation of property at the time of the Accident was *for compensation*, the Court concludes Old Republic waived that argument by not including it in its initial brief, and the Court declines to address it.  *See Hamed v. Saul*, 432 F. Supp. 3d 610, 613 (E.D. Va. 2020) (concluding that an issue raised for the first time in a reply brief on summary judgment was waived).

[9] Old Republic asserts that based on the facts of this case, the applicable federal financial responsibility minimum was $750,000.  [Doc. 99 at 3.]  Foster has not disputed that point, but nonetheless argues, for the reasons to be discussed, that the terms of the MCS-90 form nonetheless establish a higher limit for the Endorsement.  [*See generally* Doc. 112.]

which is the minimum financial responsibility requirement for the property transported by the tractor-trailer involved in the accident.[10]  [Doc. 99 at 3–8.]

<u>Analysis</u>

MCS-90 endorsements are required to be on the form prescribed by the FMCSA and approved by the Office of Management and Budget.  49 C.F.R. § 387.15.  "The operation and effect of the MCS-90 endorsement is a matter of federal law."  *Canal Ins.*, 320 F.3d at 492.  In construing such endorsements, courts should examine the plain language of the endorsement and read it in conjunction with the statute.  *See Lincoln Gen. Ins. v. De La Luz Garcia*, 501 F.3d 436, 440, 441 (5th Cir. 2007).

In this case, Old Republic filled out one section of the Form MCS-90 as follows:

> The policy to which this endorsement is attached provides primary or excess insurance, as indicated for the limits shown (*check only one*):
>
> ☒*This insurance is primary and the company shall not be liable for amounts in excess of  $ 1,000,000  for each accident.*
>
> ☐*This insurance is excess and the company shall not be liable for amounts in excess of  $ _____  for each accident in excess of the underlying limit of  $ _____  for each accident.*

[Doc. 80-1 at 76.]

The form also includes the following language, as is relevant here, and as is required by 49 C.F.R. § 387.15:

> The insurance policy to which this endorsement is attached provides automobile liability insurance and is amended to

---

[10] Although Old Republic does not argue this point in support of its own summary judgment motion, it does briefly mention it in its reply in support of that motion.  [Docs. 83-1 at 31–33; 106 at 3.]

assure compliance by the insured, *within the limits stated herein*, as a motor carrier of property, with Sections 29 and 30 of the [MCA] and the rules and regulations of the [FMCSA].

In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, *within the limits of liability described herein*, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the [MCA] regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. . . .  It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, *within the limits of liability herein described*, irrespective of the financial condition, insolvency or bankruptcy of the insured.  However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect as binding between the insured and the company.  The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.

It is further understood and agreed that, upon failure of the company to pay any final judgment recovered against the insured as provided herein, the judgment creditor may maintain an action in any court of competent jurisdiction against the company to compel such payment.

*The limits of the company's liability for the amounts prescribed in this endorsement* apply separately to each accident and any payment under the policy because of any one accident shall not operate to reduce the liability of the company for the payment of final judgments resulting from any other accident.

[*Id*. at 77 (emphases added).]

22

On the page on the form following the above-mentioned references to "limits" is a page with the heading, "SCHEDULE OF LIMITS — PUBLIC LIABILITY." [*Id.* at 78.] That page describes the different financial responsibility limits that the MCA requires depending on the type of carriage and the commodity transported. [*Id.*] As noted, these range from $750,000 for nonhazardous property transported for-hire in interstate or foreign commerce with a gross vehicle weight rating of 10,000 or more pounds, to $1,000,000 for transportation of certain other types of property, to $5,000,000 under certain circumstances for hazardous materials. [*Id.*] Directly under the schedule of limits, the form states, "The schedule of limits shown does not provide coverage. The limits in the schedule are for information purposes only." [*Id.*]

The Court concludes that Old Republic's liability under the Endorsement is capped at $750,000. As noted, the body of the endorsement in the form that the applicable regulation requires states repeatedly that liability under the Endorsement must be "within the limits of liability described herein," "within the limits of liability herein described," and other words to that effect. [*Id.* at 77.] The Court concludes that those "limits" include both the amounts included in the Schedule of Limits and the amount in the form's blank for identifying the limits of the liability policy that the MCS-90 endorsement amends.[11] Indeed, construing these references to "limits" not to include those in the Schedule of Limits would render meaningless the inclusion of the Schedule of Limits in the MCS-90 endorsement form. *See Harris v. Epoch Grp., L.C.*, 357 F.3d 822, 825 (8th Cir. 2004) (explaining that, under federal common law, contracts are construed to give meaning to

---

[11] As the Court has observed, the MCS-90 endorsement form must be construed in conjunction with the statute and regulations, *see Lincoln Gen. Ins.*, 501 F.3d at 440, which also include the applicable schedule of limits.

23

each term and to avoid rendering some terms superfluous). And, as noted, Foster has not disputed Old Republic's contention that in light of the applicable facts, the MCA-mandated minimum financial responsibility for the trip at issue was $750,000. [Doc. 99 at 3; *see generally* Doc. 112.] Because the $750,000 limit applies for the trip in question and it is less than the $1,000,000 limit of the liability policy, the $750,000 limit controls.

Foster nonetheless argues that the $750,000 is merely the *minimum* amount of financial responsibility that United Transportation was required to maintain and that the terms of the Endorsement demonstrate that the parties here exceeded that minimum. [Doc. 112 at 6.] Foster is likely correct to the extent she suggests that, strictly speaking, the MCA does not prohibit a motor carrier from obtaining surety coverage for the public in an amount greater than the MCA mandates. Nonetheless, that does not change the fact that "[t]he purpose of the financial responsibility provisions of the [MCA] is to assure the general public that a motor carrier maintains *an adequate level of financial responsibility* sufficient to satisfy claims covering public liability." *McGirt v. Gulf Ins.*, 207 F. App'x 305, 308 (4th Cir. 2006) (cleaned up); *see also Kline v. Gulf Ins.*, 466 F.3d 450, 455 (6th Cir. 2006) (explaining that the "'purpose of the [MCS-90] endorsement is to give full security for the protection of the public *up to the limits prescribed*'" by federal regulation) (quoting 46 Fed. Reg. 30,974 (1981)); *Titan Indem. Co. v. Gaitan Enters.*, 237 F. Supp. 3d 343, 347 (D. Md. 2017) ("The MCS-90 is the mechanism established by the Department of Transportation to impose the 'minimum levels of financial responsibility' required by § 30 of the [MCA]. 49 U.S.C. § 31139(b); 49 C.F.R. § 387.7(d)."). Indeed, the prescribed MCS-90 form reflects that purpose. [*See* Doc. 80-1 at 77 ("The insurance policy to which this endorsement is attached . . . is amended *to assure compliance* by the

24

insured, within the limits stated herein . . . with Sections 29 and 30 of the [MCA] and the rules and regulations of the [FMCSA]." (emphasis added).]  The MCS-90 was not designed to be a vehicle for motor carriers to altruistically provide the public with greater protection than the law requires.  *Cf. Kline*, 466 F.3d at 456 ("The federal government balanced the need to compensate victims with the needs of industry and determined the appropriate minimum compensation for members of the public.").

Here, it could not be reasonably inferred that by truthfully reporting on the MCS-90 form that $1,000,000 is the limit of the liability policy to which the Endorsement is attached, the parties intended to provide greater protection for the public than the law requires.  *See Yeates*, 584 F.3d at 887 (noting that although the limit of the underlying liability coverage was $1,000,000, and the MCS-90 form blank was filled in accordingly, the difference between that limit and the MCA's $750,000 limit for transport of non-hazardous property was "explained as a result of the higher limits required for the transport of oil and certain hazardous cargo"; concluding that an insurer that obtains a liability policy with a $1,000,000 limit does not "necessarily expose[] itself to the highest possible limits as delineated by its underlying insurance policy" for a trip requiring financial responsibility of only $750,000).  Rather, the Court concludes that, given the purpose of MCS-90 endorsements to satisfy a motor carrier's *minimum* financial responsibility requirement, the Endorsement here can only be reasonably construed as providing only the level of financial responsibility that the law requires.

It is important to emphasize that this construction of the MCS-90 form does not render surplusage the language under the Schedule of Limits that states, "The schedule of limits shown does not provide coverage.  The limits in the schedule are for information

25

purposes only." [Doc. 80-1 at 78.] Rather, that language serves to clarify that although the Schedule of Limits provides a *ceiling* for coverage based on the MCS-90 form, it does not provide a *floor*. Thus, for example, in the case of a liability policy with limits of $1,000,000, the "does not provide coverage" language would clarify that the insurer's liability under the MCS-90 endorsement is limited to $1,000,000, even if the specifics of the trip required the motor carrier to maintain financial responsibility of $5,000,000. In such a case, the insured would need to utilize another source in combination with the attached MCS-90 endorsement to meet the MCA's minimum requirements.[12] *See* 49

---

[12] In arguing that the "limits" referred to in the Endorsement do not include those listed in the Schedule of Limits, Foster draws support from *Hamm v. Canal Ins.,* 10 F. Supp. 2d 539 (M.D.N.C. 1998), *aff'd*, No. 98-2068, 1999 WL 232034 (4th Cir. Apr. 21, 1999). [Doc. 82-1 at 7.] That case is distinguishable from the present one, however. In *Hamm*, a truck owned by an interstate motor carrier was involved in an accident that resulted in several deaths and severe injuries. *Id.* at 541. Injured parties and their representatives brought two separate civil actions against the motor carrier's insurer (the "Insurer") and the owner of the truck. *Id.* The plaintiffs in those actions also brought a declaratory judgment action seeking a declaration that the Insurer was directly liable to pay up to the limit of the liability policy it had issued to the motor carrier for each final judgment the injured parties obtained against the motor carrier. *Id.* at 540. The Insurer subsequently filed a motion for judgment on the pleadings, contending that the $1,000,000 per accident limit in the liability policy capped the Insurer's potential financial obligation as a result of the accident. *Id.* The district court granted the Insurer's motion, concluding that both the MCA and the MCS-90 endorsement "tie[] the potential liability of an insurer to the amount of the security stated within the [liability] policy," which was $1,000,000 million per accident. *Id.* at 547. The court therefore concluded that "in the event of a final judgment of liability, [the Insurer] may satisfy its financial obligation to its insured for the [accident] by tendering the policy limits of [$1,000,000] . . . ." *Id.* at 548. The Fourth Circuit affirmed on appeal in an unpublished opinion, adopting the reasoning of the district court. 1999 WL 232034.

The Court concludes that the reasoning of *Hamm* does not squarely address the issue before the Court today. In *Hamm*, the issue before the court was whether the MCA or the MCS-90 endorsement could *increase* the insurer's potential liability beyond the limits of the liability policy to which the endorsement was attached. Indeed, the Insurer itself contended that its liability based on the accident was limited to $1,000,000. *Id.* at

U.S.C. § 31139(f)(3) (providing that a motor carrier need not satisfy the MCA's financial

responsibility requirements with a single policy or even a single type of source); *Shelter*

*Ins. v. Gomez*, 947 N.W.2d 92, 103 (Neb. 2020) (holding that federal law does not "require

an insurer to issue a policy with liability limits that satisfy a motor carrier's minimum level

of financial responsibility").

In sum, construing "limits" in the MCS-90 form to include those set out in the MCS-

90's Schedule of Limits is not only necessary to avoid rendering mere surplusage of the

Schedule of Limits, it honors the purpose of the form, which is to facilitate a motor carrier's

compliance with the minimum financial requirements that the MCA establishes.

541. The court therefore had no occasion to decide whether the Insurer's liability under the MCS-90 endorsement was capped at the MCA's minimum limits.

The Court notes that its research has also uncovered two cases in which the courts held, on facts essentially identical to those in the present case, that the insurer issuing the MCS-90 endorsement was liable on the endorsement up to the limits of the liability policy to which the endorsement was attached. *See Lincoln Gen. Ins. v. Pacheco*, No. EP-1 1-CV-482-DB, 2012 WL 12539325, at *4 (W.D. Tex. Mar. 2, 2012) (ruling that when the blank on the MCS-90 form was filled in with $5,000,000, the insurer was liable under the endorsement for that amount even when the amount of financial responsibility required for the vehicle involved in the subject accident was $1,500,000); *Fairmont Specialty Ins. v. 1039012 Ontario, Inc.*, No. 2:10 CV 070, 2012 WL 2343662, at *1–3 (N.D. Ind. June 19, 2012) (granting summary judgment to the injured party on facts essentially identical to those of the present case). The Court finds these decisions unpersuasive. In *Pacheco*, the court relied in large part on the fact that the MCA "provides a financial minimum, not a financial maximum, for financial responsibility to the public." 2012 WL 12539325, at *4. But, in the Court's view, that reasoning ignores the reality that the MCS-90 form was designed simply to allow motor carriers to comply with the MCA's requirements, which are that motor carriers maintain certain minimum levels of financial responsibility. *Pacheco* also relies on *Carolina Casualty Insurance Co. v. Estate of Karpov*, 559 F.3d 621 (7th Cir. 2009), s*ee Pacheco*, 2012 WL 1259325, at *3, but *Karpov*, like *Hamm*, merely held that an insurer's liability for an accident was capped by the limit of the liability policy to which the MCS-90 endorsement was attached, a result inapplicable to this Court's analysis in the present case. *Karpov*, 559 F.3d at 623–25. And *Fairmont Specialty* also relied on several cases that held merely that the MCS-90 endorsements did not increase the insurer's potential liability beyond the limits of the liability policies to which the endorsements were attached. 2012 WL 2343662, at *3.

Accordingly, the Court concludes Old Republic's liability under the Endorsement is capped at the federal financial responsibility minimum limit of $750,000.  Based on Old Republic's stipulation [Doc. 63 ¶ 4], Old Republic is liable to satisfy the Default Judgment up to that amount, but only that amount.  Thus, Foster's and Old Republic's summary judgment motions concerning Foster's crossclaim are both granted in part and denied in part.[13]

## CONCLUSION

In conclusion, Progressive's motion for summary judgment [Doc. 86] is GRANTED; and Foster's and Old Republic's motions for summary judgment [Docs. 82; 83] are each GRANTED IN PART and DENIED IN PART.  Foster's motion is granted insofar as Foster is entitled to a declaratory judgment that Old Republic must satisfy $750,000 of the Default Judgment, and Foster's motion is otherwise denied.  Old Republic's motion is granted

---

[13] Although Old Republic and Foster have argued the issue of what limit applies to the Endorsement in the context of Foster's entitlement to summary judgment [Docs. 82-1 at 6–8; 96 at 3–5; 99 at 3–8], and Old Republic did not argue this issue in its initial memorandum in support of its summary judgment motion [*see generally* Doc. 83-1 at 31–33], the Court concludes that, with Foster having had a full opportunity to be heard on this issue, partially granting summary judgment to Old Republic on this basis is appropriate. *See Moore v. Equitrans, L.P.*, 27 F.4th 211, 224 (4th Cir. 2022) ("'[D]istrict courts are widely acknowledged to possess the power to enter summary judgments *sua sponte*, so long as the losing party was on notice that she had to come forward with all of her evidence.'"); Fed. R. Civ. P. 56(f) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant; (2) grant [a summary judgment] motion on grounds not raised by a party; or (3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."); *see also Gibson v. Mayor of City of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004) (recognizing three different exceptions to the ten-day notice requirement prior to a sua sponte grant of summary judgment—"the presence of a fully developed record, the lack of prejudice, or a decision based on a purely legal issue"—and holding that any of the three would justify a sua sponte grant of summary judgment in that case); *Johnson v. Pa. Wire & Rope Co.,* No. 88-1118, 1989 WL 5428, at *2 (4th Cir. Jan. 13, 1989) (unpublished opinion) (noting that summary judgment is proper on a sua sponte basis "where the purposes of Rule 56—notice and an opportunity to be heard—are achieved").

insofar as it is liable under the Endorsement to satisfy only $750,000 of the Default

Judgment.  Old Republic's motion is otherwise denied.

IT IS SO ORDERED.

<u>s/ Jacquelyn D. Austin</u>
United States District Judge

May 6, 2026
Columbia, South Carolina

29